good morning may it please the court I am a little scratchy this morning as I have a fever however the one issue I wanted to raise early was I'll save two minutes for rebuttal and I there are a number of issues in this case I don't think I'm going to be able to address all of them and I just want to make sure that the court understands that we're we're not waiving issues that are raised in the year this matter began 1998 when Professor Agarwal contracted with University of Cincinnati to become a distinguished professor of computer science and computer engineering with discretionary authority over about a million dollars in grant money this money was passed by the legislature it the facts are myriad in the case and rather than me going into large amounts of facts I'm simply going to refer everybody to document 90 which is the the plaintiff's response to the motion for summary judgment there's about 40 pages of heavily footnoted facts there and if you have questions on those I'll certainly address them place to start by the way professor Agarwal came to the University of Cincinnati from North Carolina State and he was induced to come here because of the number of things that were included in his what I've just mentioned was a hundred thousand dollars in matching funds by the university and some promises about faculty to support his research efforts I know that this is a very fact-intensive case could you focus us on what you think are the legal issues that the district judge got wrong yes I'm going to do that right now what I think that where the judge went wrong is in the area of adverse employment actions she said that even though professor Agarwal lost the opportunity to get about two million dollars in grant money during a period of time when John Bryan had revoked his ability to that plus being brought up on charges twice which led to about seventy some thousand dollars in attorney's fees plus health problems that are related to heart conditions and anxiety and so forth from being shall we say brought up on disciplinary charges that professor Agarwal had no tangible adverse employment actions taken against him I think that this well the courts biggest problem here was that they continue that the court continued to to violate Anderson against Liberty Lobby Incorporated Reeves against Anderson plumbing met Sushita Electric against Zenith all these cases say is that in a summary judgment you must not take inferences in favor of the moving party was the reason why the district judge said that the only adverse employment action was the denial of merit pay because of the timing of these other actions that they heard outside of the relevant statute of limitations that's not that's not correct they all occurred inside except for the diversion of the three hundred and forty five thousand dollars and the business over reduced lab space and the business about moving professor Agarwal away from his into a different building and then the Dean took his office those are outside the two-year statute I still our position is that this was a hostile environment and I'll talk about the Morgan case a little bit later on because the Morgan case is really favorable to this case the first time I read it I didn't think so but after I read it further I mean Morgan says look you may not be able to raise claims that are from stuff that's outside the statute of limitations period but you can certainly use it for evidence and there's more authority to that effect I'll get to it as time goes on that you know just because you can't make it a claim doesn't mean you can't use it as evidence so once we decide that professor Agarwal indeed had some tangible losses as a result of what the university did and this I don't know the court doesn't ever talk about forklift or Burlington Northern cases that say that if your job is harder you have tangible employer actions against you she basically says well all the stuff was temporary well Burlington Northern certainly says the temporary losses I think it was 37 days in that case are actionable so I thought the whole decision kind of on that issue just flew in the face of Harris against forklift and she cites the district judge cites this case Mitchell against Vanderbilt the thing about Mitchell against Vanderbilt first of all it was pre Burlington Northern but the facts in Mitchell against Vanderbilt were extremely different than the Agarwal case and Mitchell was not a big money grant obtainer for the medical school at Vanderbilt he was simply putting in his time to retirement in Agarwal's case he was bringing in three and four hundred thousand dollars in grant money every year so while it may not have been much to have certain lose his ability to make get grants for professor Mitchell it certainly was a different situation for professor Agarwal. Do you need to show that you're comparable to some similarly situated person outside the protected group and was that another ground that the district court relied on? She talked about that my view on that is a little different and I'll get to it because we have the number of comparators I think there were one two eight comparators that we cited to but getting back to McDonald prima facie case litigation it's been my impression from mostly Ursegovitz against Irwin and also a little bit older case which was the case written by Judge Gilman I think or maybe it was Merritt that in order to show a prima facie case you don't necessarily have to use comparables. For instance here we had statements by the Dean that's the defendant Montemagno that he didn't like the way Indians well it didn't come across quite that crisply he didn't like the way Eastern professors meaning India and China treated their graduate students and he specifically mentioned India and professor Agarwal. Now there's we argued that that was direct evidence of discrimination the judge says no but even if she's right we certainly can use that as part of the prima facie case so we add that to two disciplinary proceedings and one letter of August 28 2009 taking away professor Agarwal's graduate program by refusing to allow grants and graduate students and we have a completely different situation so you pattern and practice evidence against professor Bhattacharya and you have basically a prima facie case right there but we brought more. There's a chart page 75 of document 90 which talks about the professors all of whom were in engineering all of whom were in electrical or computer engineering who had done various things that brought disciplinary action from the Dean. Not one of them did the Dean suggest that he be suspended for a term pay $24,000 and have his teaching load changed and his title erased. These other folks they got away with written warnings, letters of reprimand, all negotiated by the way. There were a couple of letters of apology in there so the chart on page 75 shows that as far as what Monty Monia was doing not necessarily the grievance committee because the grievance committee was is not a party to the action but what Monty Monia was doing was the white guys they have a meeting they decide what they were going to do about the discipline and they do it and there'd be no hearing no stuff before the grievance committee and no threats of messing up a guy's career. Those were the first set of comparators that we proposed. There's a second set includes the same guys Phil Wilsey and Fred Bayette who apparently misappropriated some money from a grant and took some they spent it on themselves somehow. Now the judge didn't really address any of these comparators even though some of them and maybe most of them were of exact matches but we don't have to have exact matches. We don't have 20,000 employees to database to use. We had just the professors in the engineering school in electrical and computer engineering and by the way Agarwal was switched back and forth between those two programs at times and for reasons which get complicated because I think that the Dean was worried about the electrical engineering being accredited so he moved some people out of computer engineering which basically kind of deep six the program and of course he was attacking the program anyway and the pattern and practice evidence against Professor Bhattacharya is amazing. Bhattacharya said that he wasn't discriminated against because he was. Yeah if he said he was discriminated against he'd been out on his ear. He knew that and he also said that he and Professor Agarwal were treated worse than any two professors he'd ever seen. So yeah he did say that. What it's worth is another story because it was clear that Bhattacharya had already lost his headship and been you know reduced to an ordinary faculty member and that the Dean said he'd resigned. He denied it but he met a bitter end with Dean Montemagno and I asked him do you know of anything that occurred that would have justified the Dean kicking you out of the headship and for basically no reason. He said he didn't know of anything. I see that your red light is on so if you want to save your time your two minutes for a rebuttal you may or if you want to use it now you may. I think I'll use it now. Pretext is another issue. Now in the reply brief I listed a bunch of things on pretext and this gets us to the Morgan case. I do think that there was a long history starting in 2006 when Montemagno came to the University where he took at every opportunity a position against Professor Agarwal. First he took his money then he took his office then he messed up his lab space then he brought him up on charges that were he he had to know the charges were false and then because of some things that were said during the hearing and the first grievance we had to file a second grievance because the University was threatening to bring him up on charges a second time. In fact they never did because John Bryan decided by decree a bunch of things that Agarwal could no longer do. Now all of this was pretextual on the idea that all of these charges were false. Now I realize that there may have been a reason or two to say that certain things were connected by the University. Well it's actually John Bryan and the University is no longer a party but we thought we brought ample evidence on pretext and we don't have to bring new evidence we can certainly refer back to the old evidence from the prima facie case. Now. Did you just say that the University is no longer a party? Well the contract action against the University was dismissed by a district judge for reasons that don't really hold up so well anymore. There's this case called Lipatese against the Board of and in that case the Supreme Court says if you're sued in state court and you remove it to federal court you're waiving 11th Amendment immunity right there because you could have stayed in state court and used state immunity. Now I think the judge got a little confused on this because this is a confusing area and she said well the reason why Lipatese doesn't apply to this case is because the state of Ohio has not waived their immunity in state court. They only waived it in relation to the court of claims. Well this this is kind of a true statement but it's it's it's not apropos because the action we brought against the University was equitable in nature. We just asked them to do what they were supposed to do on Agarwal's contract and that's all. We didn't ask for money damages or anything like that although I did want some attorney's fees thrown in there but that's really not against the University. So there never was any immunity at the state level on an equitable claim and the difference the judge cited is just a distinction without a difference. And your red light has been on. I will sit down. Thank you very much. Good morning. May it please the court. Drew Pearsall of Zashun and Rich on behalf of the Appalese. Carlo Montemagno, John Bryant and the University of Cincinnati. Your honors the district court's analysis in this matter was spot on. First and foremost the bulk of the adverse actions alleged by Professor Agarwal are time barred pursuing a count to the two year statute of limitations in 1983 actions here in Ohio. Secondly she properly determined that he has no direct evidence of discrimination and moreover using the indirect evidence method of proof he's only established one adverse action but nonetheless Judge Beckwith analyzed whether or not even the time barred actions rise to the level of materially adverse. She properly found they did not. And even analyzing the disparate treatment comparators of course she found that they there were none thus no prima facie case but even if Professor Agarwal could establish a prima facie case with respect to any adverse action he's alleged she found there was, he could not establish that any of the reasons given for the various actions were pretexts for race or national origin discrimination. Turning first to the time barred issue, Professor Agarwal relies on the continuing violations theory as an initial matter it should be noted that this theory rarely extends is what the Sixth Circuit case law says it rarely extends to 1983 actions and is primarily used only in Title VII claims. There's two methods of proving a continuing violation theory. The first method is to bring a claim of a hostile work environment which was not done here until this level of appeal. However, Judge Beckwith also found that this was a discreet act case. There's a collection of discreet acts. This is not a hostile work environment claim. The second method of proof is to demonstrate a longstanding and demonstrable policy of discrimination. Here to your point Judge Moore, Professor Agarwal relies on Prabir Bhattacharya and alleged discrimination against him. However, when he was deposed he denied that Carlo Montemagno discriminated against him thus it's a little unusual theory to claim discrimination when the victim denies being discriminated against. Well, but there could hypothetically be some overt discrimination against someone on the basis of a protected characteristic and the person for whatever reason doesn't want to confront the employer with that. I suppose that's. So the comments about eastern people not being, not dealing with the graduate students properly, could you address that? Absolutely, that was never said and that's Judge Beckwith. Clearly stated that and I have referenced that throughout both the briefing at the district court level and this level. The phrase easterners was never used in that context. There was no reference to Indians, there was no reference to national origin, and there was no reference to race. The comment was, Dean Montemagno stated, I believe there is a cultural divide between the way I view graduate students and other professors view graduate students. And he explained himself both at the grievance hearing where that comment was made in a very public arena at a grievance hearing and he also had an opportunity to explain that in his deposition and he clearly stated that that was his view of how graduate students are to be treated and respected and he believes that they should be viewed as colleagues whereas other professors within the department essentially view them as sort of worker bees to do bidding and not to be seen and not heard from. And he didn't make a distinction on the basis of nationality? Absolutely not. I frankly don't know where this reference to easterners is coming from. It's not in the record anywhere, not once. Again, that ties into the direct evidence. Judge Beckwith conducted a thorough analysis of whether or not that comment rose to the level of direct evidence. Of course it doesn't and Professor Agrawal himself conceded at his deposition that any number of inferences would have to be drawn in order for that comment to rise to the level of direct evidence. And then if we take a look at the materially adverse employment actions, let's talk first about these OBR funds. The purpose of the funds, they're issued by the Ohio Board of Regents. They're issued to the University of Cincinnati, not to Dharma Agrawal. They're issued on a biannual basis. Every two years they're up for review. Dharma Agrawal knew when he was hired that they were not an indefinite funding source. He knew that they would expire at some point in time. As early as the, he was hired in 98, as early as the year 2000, there's clear testimony in the record, there's documents back and forth. What are we going to do when these funds run out? They're going to run out someday. How do we fund Professor Agrawal? In 2002, there's a memo from, I have it right here, there's a memo from Tom Manti, his department head at the time, that in no uncertain terms says, stop using these OBR funds to line your own pocket. The purpose of the funds is to establish a physical interdepartmental center to further the academic interest and produce more PhD students in Ohio. From 1998 until 2006, when Carlo Montemagno arrived on campus, there was no center and there was no progress made on the center. That is not in dispute. Professor Agrawal concedes that that's the case. He used the OBR funds as a personal slush fund and he was cautioned not to do that in the year 2002 by a prior department head. And then before Professor Montemagno ever sets foot on campus in 2006, his new department head, Hal Carter, Professor Agrawal's new department head, said we're taking the discretionary control and we're going to start taking that control away from you because you're not using the funds for their intended purpose. From 1998 until 2006, he didn't develop the center. He had nothing to demonstrate that he had done any work on the center other than lining his own pockets and hiring his own grad students to further his own research. This was seed money to further the academic interest of the university. He didn't use it for that purpose. That's not in dispute. If you take a look at the loss of office space, well again the OBR funds being redirected is time barred as clearly found by Judge Beckwith, as well as the loss of the office space, but a loss of office space as extreme as 2,000 square feet to 150 square feet as found by Mitchell v. Vanderbilt University. What about the merit pay issue? That's the one adverse action that the district judge found. It is and we don't concede that. Concede what about it? That it's an adverse employment action. You don't concede that it's an adverse? I do. You do. It's an adverse employment action. Okay. The 2010 merit pay denial because it impacts. So why is that not actionable in terms of going forward after the summary judgment motion? If you take a look at the merit pay denial, first of all the appropriate review period was September 1, 2008 until the end of the year, December 31, 2009. It was a 16 month evaluation period. Prabir Bhattacharya, who was Professor Agarwal's department head at the time, Dean Montemagno requested that he submit recommendations, not definitive numbers, to him recommending various levels of pay for various professors. You could either get a 1% increase, a half percent increase, or a 0% increase. What Prabir Bhattacharya did was only recommend Professor Agarwal for a half percent pay increase. If you take a look at Dean Montemagno, he enlisted the assistance of two deans, I'm sorry, two assistant deans to help him with the review process. He frankly thought that Prabir Bhattacharya was overly generous in giving out merit pay and also believed that the financial compensation of the particular employee, which necessarily impacts the expectations placed upon that employee, needed to be taken into account as well. And Professor Agarwal earns approximately $70,000 more than any other professor in his own department. But what we really get to though is that the two Caucasian professors who did receive pay increases at that time, merit pay increases, were Professors Anningstein and Professors Schlipf. They both only received a half percent increase. No one in the department received a 1% pay increase, it should be noted. And those two individuals didn't remotely engage in a course of conduct during the applicable review period. Professor Agarwal uses a five year look back period in his analysis. Judge Beckwith of course pointed that out and said that's not the relevant time frame to be analyzed. And it also should be noted that he created a chart based on his subjective review of the websites of the professors. I don't know how he came up with a lot of his results, but again that's the evidence that he's put forth in his brief, this five year look back chart. If you take a look at what transpired from September of 2008 to December of 2009, it wasn't a very good time for Professor Agarwal at the university as found, not by Dean Montemagno and Vice Provost Bryan, but if you take a look at the first grievance panel finding, although they did recommend that he receive a written reprimand, which does not exist to anyone's knowledge, nor is it an adverse action because it's not tied to a concrete loss, which is what is required in the circuit for a written reprimand to constitute an adverse employment action. But if you take a look at the first grievance panel finding, they say, Professor Agarwal has consistently, knowingly, and admittedly failed to obtain sponsored research service approval in advance for his grant proposals in violation of UC policy. He had no right to promise Ben Shia a position without securing prior approval or a firm funding commitment. He has historically failed to file his outside activity reports. He has a pattern of poor student supervision. He skirts UC rules for his own convenience. He improperly replicated some of his own previously published work in his subsequent professional publication. He fully admits to paying employees from federal funds and certifying labor verification statements when the employee was not working on that particular grant. There were also a lot of findings that your response was excessive, right? Well, that's what he's claiming. If you look at the internal audit report that was issued, which has no affiliation whatsoever with Dean Montemagno or Vice Provost Bryan, they said the grant restrictions imposed on him should have been greater. That's how poorly he was administering his grants, and frankly, he was lying on his grants. I frankly think the response was not as severe as it should have been. There's overwhelming evidence. If you take a look at the beginning of the Ben Shia situation and his complaint letter, for the reasons I just stated, he hired him without a firm funding commitment from the university. You can't do that. That's absolutely against the rules. We have ample testimony. He says that basically everybody in the department was messing up on everything, and so he has this chart in the brief which goes through various professors and their wrongdoing and then the proposed discipline of them. And his theory is that this is obviously ethnically-based discrimination that's going on. Well, I would respond to that and say, first and foremost, what Dean Montemagno did is he proposed discipline. It was not upheld by the grievance panel. He can't. I didn't hear you. He proposed what? He proposed discipline upon Professor Agarwal. He can't do that. Well, he can propose it, but it has to be upheld by a grievance panel. So there was no discipline placed upon Professor Agarwal. If you take a look at the other individuals he compares himself to, there's several of them who received written warnings, and frankly for behavior that doesn't remotely approach defrauding the federal government. Keep in mind that the University of Cincinnati had to pay Ben Chee $24,000 out of its own pocket because Professor Agarwal had frankly screwed up the situation so severely and there was no documentation. He lied at the first grievance hearing which resulted in the second grievance hearing. He claimed that Ben Chee was out of the country not doing any work on a specific grant. It turned out not to be true. I have no idea why he would lie about that and admit, you can tell from the transcript of the hearing and you can tell from the briefing, the hearing grievance panel members were flabbergasted and shocked at his testimony when it turned out not to be true. But still, to your point, he's engaging in behavior that is far more egregious than anyone, failure to show up to teach a class or two, or failure to advise a graduate student on a particular issue. That's not even in the same ballpark as defrauding the federal government, lying in a hearing, failure to secure funding, and not to mention the fact that his own co-principal investigator on a grant, Mingming Liu, which Professor Agarwal completely and totally ignores throughout this proceeding, she refused to sign off on labor verification statements to the federal government for work performed by Professor Agarwal's students. Clearly, something is going on here. As you might suspect, it's a highly unusual situation where one professor won't sign off on the work of another professor's grad students. This isn't remotely comparable behavior. It's not even in the same ballpark. As I can see, my time is coming to an end. Is the professor still at the university? Yes. Yes, sir. Quickly, he has no procedural due process claim to the extent that he has any fundamental rights, which he doesn't in his office space or his lab space. He availed himself of the collective bargaining agreement process and had a grievance hearing, which of course satisfies procedural due process. He has to identify an independent constitutional violation or behavior that shocks the conscious to maintain. Substantive due process claim, he doesn't have that. Also, I'd like to note quickly that you see as a party in this appeal, however, the district court properly determined at the early stage of this litigation that to bring a breach of contract claim against the university, you have to do that in a court of claims. You can't bring that type of claim in the court of common pleas. There's an Ohio Supreme Court case directly on point. It's a Cristino v. Ohio Bureau of Workers' Compensation. Also, by removing this case to federal court, there's a very simple distinction between here and the Lapidus v. Georgia case. In that case, Georgia had consented to be sued in the court of common pleas. Thank you. Thank you, Robert. Thank you both for your argument. The case will be submitted.